AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original   ☐ Duplicate

FILED
CLERK, U.S. DISTRICT COURT

5/8/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: *Valerian Huarte* DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT

5/8/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: JB DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| MARK ROY ANDERSON, | Case No.   2:23-mj-02298-DUTY |
| Defendant. | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of September 4, 2020, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Richard T. Higgins, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        5/8/23

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Charles F. Eick, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kerry L. Quinn (213-894-5423)

## **AFFIDAVIT**

I, Richard T. Higgins, being duly sworn, declare and state as follows:

## **I.   INTRODUCTION**

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have served in this capacity for approximately two years.  I am presently assigned to a squad in the Los Angeles Field Office that investigates white-collar crime.  In this capacity, I have been involved in numerous investigations relating to federal wire fraud, securities fraud, and similar offenses.  During the course of my duties, I have participated in the execution of several search and arrest warrants.

2.    From my training and experience, I am familiar with the criminal methods and manners of those devising and executing investor fraud schemes and other fraud schemes involving digital assets and evidence, as well as being familiar with the ways in which digital devices, such as cell phones and other electronic devices, may be employed to plan and execute such schemes.

3.    Prior to joining the FBI, I was an accountant at a certified public accounting firm called McCarty & Company PC ("McCarty").  My work at McCarty consisted primarily of performing financial statement audits and reviews of companies in the construction industry.  In that capacity, I thoroughly reviewed financial documentation in an effort to ensure the accuracy of the company's financial statements.  I also have a

1

master's degree in forensic accounting from Stevenson
University.

## II. PURPOSE OF AFFIDAVIT

4.   This affidavit is made in support of a complaint
against and arrest warrant for MARK ROY ANDERSON ("ANDERSON")
for a violation of 18 U.S.C. § 1343 (wire fraud).

5.   The facts set forth in this affidavit are based on my
personal observations, my training and experience, and
information obtained from various law enforcement personnel,
witnesses, financial institutions, phone and internet service
providers ("ISPs") and other businesses.  This affidavit is
intended to show merely that there is sufficient probable cause
for the requested complaint and warrants and does not purport to
set forth all of my knowledge of or investigation into this
matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## III. STATEMENT OF PROBABLE CAUSE

### A.   Summary of Probable Cause

6.   An FBI investigation has revealed ANDERSON is running
an investment fraud scheme involving a fraudulent hemp business
in which he is using false and misleading representations to
trick investors into giving him money for investments in a fake
hemp farm, to steal hemp from hemp farmers for payments that
never materialize, and to swindle others in the hemp industry
into giving him money for hemp products he never provides.  The
misleading representations include representations that ANDERSON

2

owns and operates a large hemp farm in or near Bakersfield, California, which he does not; that he would pay farmers for hemp, which he did not (at least in the relevant instances); and that he would deliver hemp, hemp isolate, or CBD-infused products manufactured from hemp, which did not happen.  Numerous interviews show ANDERSON solicited investments for a supposed hemp business representing to investors that their money would be used to grow and process hemp or bottle and sell finished hemp-derived products, when financial records show ANDERSON used investor money for personal expenses, including retail purchases, the purchase of a house in Ojai and surrounding citrus groves, purchases of luxury or vintage automobiles, dining, travel and entertainment, cash withdrawals, and money transfers to affiliated parties.[1]

7.   ANDERSON has a long history of defrauding investors dating back more than 30 years.  As further described below, ANDERSON has numerous federal and state convictions for a variety of fraud schemes, including soliciting investments in sham businesses, and he is currently on supervised release from his latest federal conviction (for which he was sentenced to 135 months) for soliciting investments in a largely fictitious or at least misdescribed oil business.  ANDERSON's supervised release conditions include a specific prohibition on soliciting

---

[1] ANDERSON appears to be involved in some type of illegitimate hemp business involving the hemp he is stealing from Oregon farmers, but this "business" appears to be little more than a front for his investment fraud scheme to give him the knowledge and vocabulary necessary to be able to trick investors into believing he runs a legitimate hemp business.

investments for any type of business, even a legitimate one, but as set forth below, he has been stealing millions of dollars from investors in the latest scam, which appears to have started immediately upon his release from federal prison, even while he was on home confinement in the custody of the Bureau of Prisons ("BOP") and continuing through his term of supervised release, which he is still serving.  Investigators currently estimate ANDERSON stole more than $10 million from dozens of victims in the latest scam, which appears to be ongoing.

    **B.**   **ANDERSON's Criminal History**

    8.  I have reviewed ANDERSON's criminal history, including criminal history reports and documents from the case in which he is currently on supervised release, <u>United States v. Mark Roy Anderson</u>, CR 11-199-PA (C.D. Cal.), and according to these sources, ANDERSON has an extensive criminal history, including an extensive history of defrauding victims in investment scams, including the following:

    1.  <u>ANDERSON's First Set of Criminal Convictions</u>

    9.  Between 1983 and 1986, ANDERSON devised and executed a Ponzi-type scheme to defraud investors who invested in partnerships to purchase and restore historic buildings around the country.  As part of this scheme, ANDERSON formed approximately 20 limited partnerships involving about 2,000 investors, following which he commingled funds from the various projects and diverted funds from one project to pay for another. ANDERSON perpetrated this scheme while falsely claiming to be a

California attorney (ANDERSON is in fact a disbarred attorney, previously licensed in Nevada, but not California).

10.   For this scheme, ANDERSON was charged in <u>United States v. Mark Roy Anderson</u>, CR 91-193-AWT (C.D. Cal.), and he ultimately pleaded guilty to mail fraud and agreed to pay $6,801,035 in restitution.[2]  The court in that case sentenced ANDERSON to 84 months imprisonment to run concurrently with the sentences imposed in state cases discussed below charging ANDERSON with state crimes for additional fraud and forgery crimes.

> ### 2.   ANDERSON's Second Set of Criminal Convictions

11.   While he was operating the Ponzi scheme described above, ANDERSON also stole money from other victims, including victims who gave him money to purchase properties ANDERSON falsely claimed to own.  ANDERSON also fabricated evidence for use in civil trials.  For this conduct, which took place in the mid to late 1980s, ANDERSON was charged with five counts of grand theft, two counts of preparing false evidence, and two counts of attempted grand theft in Case Number LA003811. ANDERSON pleaded guilty to all of these counts and was sentenced to four years in state prison.

> ### 3.   ANDERSON's Third Set of Criminal Convictions

12.   At the same time as he was committing the conduct described above, ANDERSON was engaged in additional criminal

---

[2] According to the government's sentencing position in ANDERSON's most recent federal case, the court in the 1991 case ordered restitution in the amount to which ANDERSON agreed, approximately $6 million, but the total losses were more than $47 million.

conduct involving falsified documents provided to a mortgage lender to secure a $120,000 loan, and for that conduct he was charged with and convicted of forgery and grand theft in Case Number LA007048.  The court in that case sentenced him to 32 months to run consecutively with the four-year sentence in the other state case, which was running consecutively to the 84-month sentence in the federal case.

### 4.   ANDERSON's Fourth Set of Convictions

13.  After he was released from prison, ANDERSON started a chain of eye surgery centers, a business that collapsed after his business partner was arrested for healthcare fraud.  Then, in the early to mid-2000s, he started another Ponzi-type scheme involving investments in a misdescribed oil business, promising investors he would invest their money in one of several oil companies or ventures, but he instead used their money for his own personal expenses.  In this fraud, ANDERSON stole more $9 million from more than 20 victims, and he was convicted of wire fraud and money laundering and sentenced to 135 months in prison and three years of supervised release in the case captioned United States v. Mark Roy Anderson, CR 11-199-PA (C.D. Cal.).

14.  According to information obtained from the BOP, on May 10, 2019, ANDERSON was released from FCI Texarkana where he was serving his sentence for his latest convictions, and he was transferred to home confinement pursuant to the Elderly Offender Pilot Project mandated by the First Step Act (he was in his mid-60s when he was released from prison and is currently 68).  As a result, he was placed at home and supervised by the United

6

States Probation Office ("USPO").  He remained on home confinement until he completed service of his sentence on November 17, 2020, and he then started his three-year term of supervised release (again being supervised by the USPO), which he is still serving as of the date of this affidavit.

15.  ANDERSON's supervised release term includes the following condition: "The defendant shall not engage, as whole or partial owner, employee or otherwise, in any business involving loan programs, telemarketing activities, investment programs or any other business involving the solicitation of funds or cold-calls to customers without the express approval of the Probation Officer prior to engagement in such employment."

16.  Based on my review of the evidence, it appears ANDERSON began the instant fraud offense immediately upon his release from prison, while he was still in BOP custody on home confinement, before he even started serving his term of supervised release, and it continued during his term of supervised release and appears to be ongoing.  As will be discussed in more detail below, the instant offense appears to have begun no later than April 2020, and likely dates back to at least August 2019 (when he started registering websites and receiving monetary transfers from likely victims), just after he was released from prison.

C.  **Evidence of the Current Scheme to Defraud**

1.  <u>Victim Interviews</u>

17.  On May 13, 2022, and October 14, 2022, federal agents interviewed J.H. by telephone.  I reviewed the report of the

first interview, personally participated in the second interview, and have reviewed documents provided by J.H.  On July 12, 2022, I also participated in a telephone interview of R.M. and have reviewed additional documents R.M. provided to law enforcement.  From these sources, I know J.H. and R.M. reported the following:

a.   In late 2019 or early 2020, ANDERSON contacted J.H. to discuss an investment in an oil-related project J.H. was managing at the time.  ANDERSON did not invest in that project, but he used information learned in discussions about that project to pitch J.H. on what he described as his own investment opportunity.

b.   Specifically, in or around April 2020, ANDERSON pitched an investment in a hemp business he claimed he was operating in California (J.H. was in Arkansas), growing hemp at ANDERSON's own farm in Kern County, California, and converting the hemp into medical grade CBD isolate to be sold to companies producing products with the isolate.

c.   ANDERSON represented investments would be used to plant, grow, and harvest hemp crops on a large plot of land in Kern County, California that ANDERSON said he owned (the "farm"), and then to convert the hemp biomass into isolate.

d.   ANDERSON claimed to be a third- or fourth-generation farmer, and he said he created a company called Harvest Farm Group, Inc. ("HARVEST FARM GROUP") to operate the hemp business.

e.   ANDERSON initially resisted providing the specific location of the farm, but after being pressed, he sent Global Positioning System ("GPS") coordinates that he claimed provided the location of the farm.  J.H. and R.M., along with a private investigator they hired, did an after-the-fact investigation, and they figured out the property was actually a vineyard in California owned by an unrelated party, which my review of property records confirms.

f.   ANDERSON said he had already completed three successful harvests of hemp from the farm, which he claimed were extremely profitable, and he said he was marketing an investment opportunity to allow investors to participate in subsequent harvests from the farm, which he represented would yield similarly large returns.

g.   ANDERSON further represented he was using his own machinery and equipment to convert the hemp harvested from the farm into hemp isolate and/or a substance called Delta 8, which is a psychoactive substance found in the cannabis plant, of which hemp is a variety.  As relevant here, hemp isolate and Delta 8 can be derived from hemp and used in a variety of consumer products ranging from olive oil to body cream.

h.   ANDERSON provided J.H. with legal documents that purported to memorialize the structure of the investment.  These documents were titled Farm Management Agreements ("FMAs"), and they purported to be agreements between HARVEST FARM GROUP and limited liability companies that J.H. would use to solicit funds from investors.  In the FMAs, HARVEST FARM GROUP agreed to grow

hemp at the farm, to process the hemp into medical grade CBD isolate, and then to sell the isolate for the benefit of the LLCs. J.H. had his attorney review the agreements, and they appeared legitimate.

       i.  ANDERSON further provided pictures and videos of hemp he had supposedly recently harvested at the farm. (In the after-the-fact investigation, J.H. and R.M. determined, through metadata embedded in the files, that the pictures and videos did not show what ANDERSON claimed they showed – <u>e.g.</u>, they were taken in different years or at different locations from what ANDERSON represented - and instead they appeared to be stock images obtained from the internet. J.H. and R.M. forwarded photos and videos that ANDERSON provided to them. As of the date of this affidavit, agents have yet to be able to extract the original metadata for these files, but we are exploring other options for checking the accuracy of the photos.)

       j.  At the time ANDERSON pitched the investment, J.H. and R.M. believed ANDERSON had a legitimate hemp business, and they raised approximately $9 million for investment in HARVEST FARM GROUP, with J.H. himself wiring ANDERSON $800,000, and R.M. wiring $50,000 from his retirement account. They also recruited other investors to invest through the LLCs, which included Hemp Pharma 2020, LLC, and Harvest 100, LLC. The different LLCs were used for different rounds of investments. Investors were told they would be investing in HARVEST FARM GROUP, a hemp business operated by ANDERSON, but they would be making their investments

through J.H., including through the LLCs and another company
J.H. controlled named BioAG Group Inc. ("BioAG").

k.  Although some investors sent money directly to
ANDERSON, including through interstate wire transfers, most of
the investors sent their money to BioAG to an account at
JPMorgan Chase ("JPMC") that J.H. maintained for BioAG.  J.H.
subsequently transferred investor funds to accounts ANDERSON
maintained for HARVEST FARM GROUP in Los Angeles at Bank of
America N.A. ("BOA"), including an account ending x2132 (the
"BOA x2132 account").

l.  According to information provided by J.H. and
R.M., as confirmed by financial records, between April 2020 and
November 2020, J.H. sent HARVEST FARM GROUP more than $9
million, which J.H. and others working with him raised from
investors for investments in HARVEST FARM GROUP.  Among the
transfers was a transfer sent on or about September 4, 2020, for
$160,000 sent by interstate FedWire transfer from an account
J.H. maintained at First National Bankers Bank to the BOA x2132
account.

m.  Prior to soliciting investor funds for ANDERSON,
J.H., through his attorney, asked ANDERSON to confirm he did not
have any prior criminal convictions and he was not the "Mark Roy
Anderson" who had prior fraud convictions.  ANDERSON said he had
no criminal history and had never heard of Mark Roy Anderson.

n.  Following the investments, ANDERSON continued to
send reassuring communications, including supposed pictures of
hemp he claimed had been harvested from the farm.  The after-

11

the-fact investigation revealed these pictures, like the others ANDERSON sent, were fake or misleading.

      o.  ANDERSON also claimed to have made two sales of isolate totaling more than $600,000 to two separate Canadian companies, and he provided invoices to this effect.  After the fraud was discovered, R.M. contacted the companies to try to determine whether the sales and invoices were real, but he did not receive a response from either of the companies.

      p.  The returns ANDERSON promised never materialized, and to the contrary, investors received at most only small amounts back on their investments.

      q.  In late 2020, after he had failed to pay the promised returns, ANDERSON proposed a buyout in which all the investors in the LLCs would receive their investments back.  In November 2020, he met with J.H. at J.H.'s daughter's house and proposed a new deal where ANDERSON would pay back investors $250,000 a month and then the remaining amount at the end of one year.  Agreements were entered in late 2020 to try to get investor money back, but ANDERSON defaulted soon thereafter, as early as January 2021, and never made additional payments, even though he continued to claim he was successfully harvesting and processing hemp.

      r.  At one point, after repeated requests for proof of product, ANDERSON sent J.H. approximately 150 kilograms of isolate.  The shipment did not include any type of certificate of authenticity to verify it was in fact isolate, but J.H. had the materials tested, and they were in fact isolate.  As

discussed below, ANDERSON appears to have been operating some type of hemp "business" in which he was processing hemp stolen from Oregon farmers.

s.   As discussed in more detail below, bank records show ANDERSON used investor money on his own personal expenses, including retail purchases, entertainment and travel, luxury and vintage vehicles, a house in Ojai with surrounding citrus groves, and other personal expenses.  ANDERSON appears to have used some investor money for the stolen-hemp "business," but all information I have collected to date suggests the Kern County farm was entirely fictional.  Regardless, none or very little of the money from ANDERSON's actual hemp "business" was given back to HARVEST FARM GROUP investors.

t.   When the after-the-fact investigation showed they had been defrauded, including showing ANDERSON was in fact the "Mark Roy Anderson" previously convicted of fraud, they reported the fraud to the FBI, and they have since been trying to get investor money back from ANDERSON.

18.  On August 19, 2022, federal agents interviewed M.C. by telephone.  I participated in the interview and prepared a report of the interview.  I have also reviewed a police report from the Deschutes County Sheriff's Office ("DCSO") in Bend, Oregon, detailing a report M.C. made to the DCSO reporting that ANDERSON stole a large amount of hemp from him in 2021.  The DCSO report also details additional interviews the DCSO conducted of other Oregon farmers who reported similar information.  I have further reviewed documents and other

information M.C. provided to law enforcement.  From these sources, I know M.C. reported the following:

      a.  M.C. is a sixth-generation Oregon farmer, who started farming in 1980.  His farming experience included both crops and cattle, but in 2016, soon after it became legal to do so, he started growing hemp.  He successfully grew hemp between 2016 and 2019 when the price of hemp was relatively high, but in 2020, the price of hemp plummeted to the point where he was left with 400,000-500,000 pounds of hemp biomass that he could not sell, and after this, he stopped growing hemp.

      b.  In about June 2021, C.L., another hemp farmer who also brokered hemp sales, put M.C. into contact with ANDERSON. C.L. told M.C. that ANDERSON was a well-established and wealthy hemp farmer (with a private plane and his own landing strip) who owned a large plot of land in California on which he was farming hemp.  C.L. said ANDERSON had a contract with a company called California Hemp Producers to process ANDERSON's hemp into Delta 8.  C.L. further represented ANDERSON was interested in purchasing M.C.'s hemp to convert it into CBD isolate or Delta 8 to be sold to downstream purchasers.

      c.  M.C. then entered into an agreement with ANDERSON to provide 270,000 pounds of hemp to process through California Hemp Producers into isolate.  As part of this agreement, ANDERSON agreed to provide M.C. with a portion of the proceeds of the sale of the isolate.  They reached a deal with minimum compensation terms for M.C.

d.   Based on these representations, in July 2021, M.C. shipped a total of 163,660 pounds of hemp biomass to the facility via eleven loads of approximately 15,000 pounds each. M.C. estimated the value of this hemp biomass was approximately $326,000. Several weeks later, C.L. asked if he could send more product; M.C. agreed, and in August, he sent approximately 110,000 pounds of additional hemp in 7 loads to a different processor.  M.C. estimated this shipment was worth approximately $151,000 ($477,000 total with the July shipment).

e.   On August 28, 2021, C.L. informed M.C. his hemp was testing poorly and could not be converted into CBD isolate because the THC (or Tetrahydrocannabinol) content was too high to be legally sold in the United States.  M.C. retested some biomass from the same crop he had shipped and provided test results showing THC content in the agreed-upon range.  He also offered to drive to the processors and retest the product he had shipped.

f.   A few weeks later, M.C. received a call from someone at California Hemp Producers confirming they had received hemp biomass from the August shipment to process under contract with HARVEST FARM GROUP.

g.   Several weeks later still, on October 10 and 11, 2021, M.C. visited the California Hemp Producers facility in Stratford, California and inquired about the eleven loads he sent to HARVEST FARM GROUP in July.  M.C. got vague and inconsistent answers, but he was ultimately given information about "junk biomass" in a field in Buttonwillow, California.

h.   M.C. drove to the location and found 39 bags of hemp biomass laying in an open field, deteriorating and damaged by the sun.  He recognized the crop as his from labeling on the bags.

i.   M.C. was told that the other 230 bags he sent were of poor quality and disposed of.  Alternatively, somebody else told M.C. that the hemp was too "hot" with THC content and could not be processed.  When M.C. pressed further, he was simply told that nobody knew where his product was.

j.   After further investigation, M.C. was able to determine that 20,000-30,000 pounds of biomass had been processed by California Hemp Producers and turned back over to ANDERSON.  An additional 100,000 pounds was still at California Hemp Producers being processed, which left approximately 150,000 pounds of biomass unaccounted for.  C.L. told M.C. that ANDERSON would not say where any of the outstanding hemp is being stored.

k.   M.C. was never paid for any of the product he sent.

l.   M.C. began doing research and learned that ANDERSON has a criminal history of large-scale financial scams. M.C. also discovered HARVEST FARM GROUP owned only 20 acres of land in central California, instead of the larger plot ANDERSON claimed to own.  The 20-acre plot was the land located behind a John Deere dealership where M.C. found his abandoned biomass. This land did not have water rights, which meant there was no irrigation to raise any type of crop, hemp included.  M.C. also investigated HARVEST FARM GROUP's website.  His son copied and

16

pasted the photos located on HARVEST FARM GROUP's website into an online search engine and discovered that the photos were stock photos from the internet.

m.   M.C. also found several other local and regional hemp farmers who entered into contracts with HARVEST FARM GROUP and had ended up losing product or money.  M.C. provided the names of these farmers to the DCSO and federal investigators. M.C. was also in contact with K.C., another individual in the hemp industry who had lost approximately $70,000 to ANDERSON in a hemp isolate transaction.

n.   DCSO interviewed W.J. and S.L., two other farmers identified by M.C., and these farmers reported stories similar to M.C.  According to the DCSO report:

i.   W.J. said C.L., the same broker who contacted M.C., also contacted him saying he could arrange the sale of a significant amount of hemp to HARVEST FARM GROUP in California.

ii.   The deal required W.J. to deliver a minimum quantity of hemp to the processor, so W.J. contacted several other regional farmers to see if they were interested, and he ultimately agreed to terms of a product split for his hemp as well as some hemp from three other farmers, and he sent HARVEST FARM GROUP approximately 120,000 pounds of biomass compiled by three different local farmers.

iii. Under the original agreement, W.J. was not responsible for shipping, but he was told HARVEST FARM GROUP was short on trucks, so W.J. agreed to send his own trucks through

17

his shipping business.  He also worked to facilitate shipping M.C.'s hemp to HARVEST FARM GROUP's processor in California.  As the deal developed, W.J. ultimately agreed to provide the shipping and transportation of all of the hemp involved in his and M.C.'s deals, with payment to be received later.  During the month of July 2021, he sent approximately 400,000 pounds of hemp biomass to the facility in Southern California at an estimated shipping cost of $60,000.

> iv.  W.J. was never paid for the shipping or the hemp.  When he realized he had been defrauded, he did his own research and investigation into the connections between C.L. and ANDERSON, and his research and investigation revealed C.L. was originally from Los Angeles but moved to central Oregon in approximately 2018 and had been farming hemp until he lost his crop in 2020.  Earlier in the spring of 2021, C.L. went back down to southern California to network and try to find a market for hemp processing.  C.L. did not have any of his own product to sell due to his poor crop the year before, and to stay in the business, C.L. set out to be more of a broker or middleman. C.L. met ANDERSON on one of his trips to Southern California through mutual acquaintances.

19.  On December 8, 2022, I interviewed S.L. by phone. S.L. reported information similar to M.C. and W.J., but S.L. interacted directly with ANDERSON.  Like other farmers, ANDERSON agreed to purchase S.L.'s unsold hemp and process it into isolate (telling S.L. he had his own large processing facility), and S.L. shipped 31,000 pounds of hemp to ANDERSON's company

HARVEST FARM GROUP.  S.L never received any payment for his hemp, and he later learned his hemp had been shipped to and processed by California Hemp Producers, which had a contract with HARVEST FARM GROUP to process hemp, and all of his hemp had been processed and provided to ANDERSON.

20.  On November 3, 2022, I interviewed K.C. by phone. K.C. is involved in the hemp industry in Nevada, and she said she was introduced to ANDERSON as a large and wealthy hemp producer, and after some interactions in which he showed her farms and facilities he claimed to own (which the investigation has shown he did not), she agreed to purchase hemp isolate from him for approximately $75,000, and wired him this amount.  She sent a shipping contractor to pick up the product, but despite repeated attempts and calls ANDERSON never gave the shipper the isolate, and he then refused to provide a refund or deliver the hemp.  At one point, K.C. agreed to have lunch with ANDERSON in Santa Monica where they again discussed logistics of shipping the isolate, and when ANDERSON went to the restroom, leaving his wallet at the table, K.C. checked his driver's license and learned his middle name was actually "Roy" not "Joseph," as he had told her, and he was significantly older than he had represented himself to be.  K.C. reported the theft to the police and her bank, and eventually received approximately $63,000-$67,000 from her bank, but she is still out the rest of the money.

21.  On March 2, 2023, I interviewed J.B.C. in person, and on March 3, 2023, I interviewed H.G. by phone, and I again spoke

with J.B.C. and H.G. by phone in separate calls on May 5, 2023, and again to J.B.C. by phone on May 8, 2023.  They reported information similar to J.H. and R.M., except the investment ANDERSON pitched to them involved bottling and selling hemp-derived products, such as CBD-infused olive oil and pain cream, and this time ANDERSON said the business was called VERTA BOTTLING and the investment vehicles were Emes Organics and Emes Organics Investors.  ANDERSON claimed he had purchase orders from at least nine separate vendors for finished products worth hundreds of millions of dollars in future revenue, such that J.B.C. and H.G.'s original investment of approximately $6 million, which they made in 2021 with other investors, was going yield more than $100 million in returns.  But as with other investments, ANDERSON did not give any money back and the promised returns never materialized.  J.B.C. and H.G. reported ANDERSON's email address was manderson9595@gmail.com.  As for recent communications:

a.   J.B.C. corresponded with ANDERSON a few days before the interview on March 2 about the investment, and he again communicated with ANDERSON by phone in late March 2023, along with communicating with him by text.  Among other matters discussed, ANDERSON reported to J.B.C. that he had told an investor to invoice ANDERSON through Emes Organics if the investor wanted his money back.

b.   On May 5, 2023, H.G. said a friend of his at another investment firm reported he was working with ANDERSON on a new business deal, and that within the last few weeks,

ANDERSON pitched the friend on the deal.  ANDERSON had given the friend some materials, which H.G. is still attempting to obtain from the friend.  The friend asked ANDERSON to front some of the money for the deal, but H.G. was not aware of further progress made on the deal.

    2.   Financial and ISP Records

22.  The bank records summarized below cover only the HARVEST FARM GROUP part of ANDERSON's investment scam; agents are in the process of obtaining financial records associated with VERTA BOTTLING and Emes Organics.  Based on my review of financial records from accounts associated with ANDERSON and HARVEST FARM GROUP, I have learned, among other things, the following:

    a.   Between November 2019 and November 2021, ANDERSON transferred or withdrew more than $1,500,000 from bank accounts maintained for HARVEST FARM GROUP at BOA, JPMC, and One West/CIT, diverting money for his own personal uses, including withdrawing more than $400,000 in cash and purchasing a property in Ojai and surrounding citrus groves for more than $1.3 million.

        i.   Title records confirm ANDERSON purchased a property located at 544 Gorham Road, Ojai, California 93023 in September 2020; surveillance I conducted at the property on April 5, 2023, shows it is a gated residence, currently boarded up, surrounded by what appear to be citrus groves.

    b.   ANDERSON also spent more than $2.3 million more on personal expenses, including (i) more than $650,000 on

vintage and luxury vehicles and related automotive expenses;
(ii) more than $142,000 on retail purchases at various retailers
including Nordstrom, Pottery Barn, Williams Sonoma, Crate &
Barrel, David Yurman, Salvatore Ferragamo, and Sephora;
(iii) more than $49,000 on food and alcohol and other items from
food retailers including $2,500 in a single transaction at
Rainbow Bar & Grill, more than $1,000 in a single transaction at
Matsuhisa Beverly Hills, more than $1,400 in two transactions at
Larsen's Steakhouse, and more than $8,900 in numerous
transactions at Via Alloro; and (iv) more than $35,000 for
travel and entertainment expenses including more than $13,000
paid to Magellan Jets, a private jet chartering service.

    c.    Bank records show at least three payments to
Public Storage in 2020 and another payment to Pods (another
storage company) in 2021.

    d.    Signature cards and account opening documents for
account records I have reviewed show ANDERSON, his sister R.K.,
and his daughter M.A. were signatories on some of the accounts,
and ANDERSON and his sister R.K. were the signatories on other
accounts.  From my work in this investigation, I know ANDERSON
has been using assets that are in his sister's name or putting
his sister's name on assets that he is acquiring, and in my
training and experience, it is common for targets to use names
of family members or other associates to hide their involvement
in transactions and ownership of assets.  For example, one of
the cars ANDERSON has been observed driving during surveillance
is a Ford Explorer registered to his sister R.K., at a post

office box in Beverly Hills ANDERSON uses as his address with
the California Department of Motor Vehicles ("DMV"), for bank
accounts, with GoDaddy.com LLC ("GoDaddy"), and as part of
subscriber information with Google.  Similarly, the one parcel
of land traced to ANDERSON in Kern County is actually registered
in the name of Harvest Farm Irrevocable Trust in ANDERSON's
sister's name.  The FBI's financial analysis, including analysis
of deposits and withdrawals into the accounts, suggests it is
ANDERSON, not his family, that is soliciting, receiving, and
spending investor money.

23.  Based on my review of records from GoDaddy, which were
first obtained in 2022 and updated in February 2023, I have
learned, among other things, the following:

a.  ANDERSON created numerous websites related to
HARVEST FARM GROUP and hemp production and processing including
harvestfarmgroup.com, hemppharmagroup.com, bioaggroup.com,
bioagfarms.com, biopharmaholdings.com, hemppharmaholdings.com,
bionoidpharma.com, refindedhemp.com, refinedhempcompany.com,
cbdpharmagroup.com, and biopharmaorganic.com registering these
websites between August 2019 and March 2021. ANDERSON's
registration of at least some of these websites is not scheduled
to expire until late 2023 or 2024.

b.  In total, between 2019 and 2023, ANDERSON
registered more than 50 separate websites, including websites
listed above, and others related to the more recent fraudulent
activity J.B.C. and H.G. reported involving VERTA BOTTLING,
including vertabottlingcompany.com, vertabottling.com,

vertabeveragecompany.com, vertaorganic.com, and
vertabeverage.com.

      c.  As of late 2021 through late 2022, some of the
websites ANDERSON was registering appear related to the alcohol
and bottling industries, such as tequilaredeye.com,
theredeyetequila.com, redeyetequilas.com, redmonkeytequila.com,
snakeeyestequila.com, crosseyedtequila.com, red-eyetequila.com,
redeyewhisky.com, redeye-tequila.com, redeyetequilaliquor.com,
redeyestequila.com, redeyetequilabrands.com,
redeyetequilainc.com, redeyetequilabottle.com,
redeyeliquors.com, redeyetequila.org, redeyedtequila.com, and
the Verta Bottling websites referenced above.

      d.  Most recently, in late 2022, the websites appear
related to the music and entertainment industries, such as
studiorecords.online, studiomusicgroup.com,
studiorecordcompany.com and studiorecordinggroup.com.

      e.  Subscriber records from GoDaddy link ANDERSON to
these websites insofar as the name on the account is "Mark
Anderson," the email address is manderson9595@gmail.com, the
physical address is the Beverly Hills post office box that
ANDERSON uses as his DMV address, for bank accounts, and as part
of subscriber information with Google.

## IV. <u>SEALING REQUEST</u>

24.  It is respectfully requested that this Court issue an
order sealing, until further order of the Court, all papers
submitted in support of this application, including the
Affidavit, complaint, arrest warrant, and search warrant.  I

believe that sealing these documents is necessary because, as far as I am aware, ANDERSON is not aware of the investigation or the government's application for the search and arrest warrants, and premature disclosure of any documents related to this application could jeopardize the investigation and encourage ANDERSON's flight from prosecution, the destruction of evidence, and the tampering with or intimidation of potential witnesses.

### V.  CONCLUSION

25.  For all the reasons described above, there is probable cause to believe ANDERSON committed a violation of 18 U.S.C. § 1343 (wire fraud).


_____
RICHARD T. HIGGINS
Special Agent, FBI


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _8th_ day of May
2023.

_____
HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE